# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-40557

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 7, 2013

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

HECTOR HUGO TOVAR,

Defendant - Appellant.

Appeal from the United States District Court
for the Eastern District of Texas

Before KING, DAVIS, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Following a motion hearing and bench trial, the district court convicted Hector Tovar of possession with intent to distribute over 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1), interstate travel in aid of racketeering activity in violation of 18 U.S.C. § 1952, and possession of an unregistered firearm (a short-barrel shotgun) in violation of 26 U.S.C. § 5861(d). Tovar challenges his conviction on three grounds. Specifically, he argues that: (1) double jeopardy bars this case because he was convicted for related conduct in the Eastern District of Pennsylvania; (2) the district court erred in denying his motion to suppress certain evidence and statements obtained during and

## No. 12-40557

following a search of his home; and (3) the evidence was insufficient to support his conviction. We AFFIRM.

## I.

The relevant criminal conduct[1] involves three key players:

1.    Defendant Tovar, a "broker" who arranged the transportation of marijuana and cocaine from Texas to Pennsylvania;

2.    Ramon Anthony "Vex" Nunez ("Nunez"), a wholesale drug distributor in Allentown, Pennsylvania; and

3.    Carlos Mejia ("Mejia"), a driver who transported marijuana from Texas to Pennsylvania.

Tovar and Nunez met through a third party in the summer of 2008, while Nunez was in Texas "looking for a source for marijuana." At that meeting, Tovar and Nunez agreed that Tovar would deliver marijuana to Nunez in Pennsylvania; the parties discussed logistics and settled on a price.

Tovar coordinated four specific shipments of marijuana from Texas to Pennsylvania in late 2008 and early 2009. First, in late 2008, Tovar arranged for the delivery of a 300-pound load of marijuana to Nunez in Pennsylvania. Mejia drove the cargo, and Tovar was present at the time of delivery. Second, in December 2008, Tovar rented a truck and U-Haul camper for Mejia to transport another load of marijuana to Nunez. Tovar did not travel to Pennsylvania for that trip. Third, in January 2009, Tovar—accompanied by his family—arrived in Pennsylvania with another load of 200-300 pounds of marijuana. Tovar and his family stayed in the region while Nunez sold the

---

[1] We describe the facts as presented at Tovar's bench trial, viewing them—as we must—in the light most favorable to the verdict. *United States v. Turner*, 319 F.3d 716, 720 (5th Cir. 2003).

drugs; Nunez then split the sale proceeds with Tovar.  Finally, in February 2009, Tovar coordinated with Nunez to deliver another load of marijuana to Pennsylvania, with Mejia acting as the driver.  Officials stopped Mejia in Rusk County, Texas, and seized 306.6 pounds of marijuana on February 25, 2009.

Tovar continued to transport drugs (specifically, cocaine) to Nunez in Pennsylvania after Mejia's arrest.  He coordinated shipments for Nunez from about March 2009 to August 5, 2009, when Nunez was arrested.

After their arrests, both Mejia and Nunez cooperated with authorities.  A special agent obtained an arrest warrant for Tovar and a search warrant for his residence on January 25, 2010.  State, local, and federal authorities executed the warrants at approximately 6:00 a.m. the next morning.  Officers entered Tovar's residence, placed him in handcuffs, and performed a search of his home.  In the course of the search, officers located and seized a shotgun in a closet.  Before he received a *Miranda* warning, Tovar admitted that he had obtained the gun from a cousin for the purpose of self-protection.  Officials later determined that the gun was stolen, unregistered, and had been altered, with a pistol grip replacing the stock and a cut-off barrel.

Officers brought Tovar to the station after his arrest.  A special agent advised Tovar of his *Miranda* rights, and Tovar signed a statement of rights form.  Tovar then agreed to participate in an interview, in which he told two special agents that he served as a "broker" between Mejia and Nunez.  He admitted that he had rented a U-Haul trailer for Mejia to transport marijuana and that he had personally transported marijuana to Pennsylvania in January 2009. Tovar denied any knowledge of the February transaction, during which Mejia was arrested with 306.6 pounds of marijuana.  With respect to the

shotgun that officers found at his residence, Tovar again indicated that he had borrowed it from his cousin, and stated that he had not modified the gun in any way since he received it. At some point during the interview, officials allowed Tovar to meet with his wife. Tovar never asked to terminate the interview, and did not request a lawyer.

Federal grand juries in the Eastern District of Pennsylvania and the Eastern District of Texas indicted Tovar on December 16, 2009 and January 26, 2010, respectively. The Pennsylvania indictment focused on Tovar's cocaine trafficking. It charged Tovar with six counts: one count of conspiracy to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 846, four substantive counts of distribution of 500 grams or more of cocaine in violation of 21 U.S.C. § 841(a)(1), and one count of aiding and abetting in violation of 18 U.S.C. § 2. A jury found Tovar guilty of four counts in the Pennsylvania indictment, including the conspiracy count, and the Pennsylvania district court sentenced Tovar to 200 months' imprisonment.[2]

The Texas indictment focused on Tovar's marijuana trafficking. It charged Tovar with four counts:[3]

Count 1:    conspiracy to possess with intent to distribute over 100 kilograms of marijuana from December 19, 2008, until February 25, 2009, in violation of 21 U.S.C. § 846;

Count 2:    possession with intent to distribute over 100 kilograms of

---

[2] The Third Circuit affirmed the Pennsylvania district court's conviction and sentence on January 17, 2013. *United States v. Tovar-Sanchez*, No. 11-3810, 2013 WL 174355, at *2 (3d Cir. Jan. 17, 2013).

[3] The Texas grand jury first indicted Tovar on slightly different counts. On the government's motion, the district court dismissed the first Texas indictment without prejudice, and the government obtained a new indictment with the above-listed counts on July 21, 2010.

No. 12-40557

marijuana on January 24, 2009, in violation of 21 U.S.C. § 841(a)(1);

Count 3:     interstate travel in aid of racketeering activity on or about January 24, 2009, in violation of 18 U.S.C. § 1952; and

Count 4:     possession of an unregistered firearm (short-barrel shotgun) on January 26, 2010, in violation of 26 U.S.C. § 5861(d).

The District Court for the Eastern District of Texas held a motion hearing and bench trial on November 8, 2011, after Tovar had been convicted and sentenced in the Pennsylvania case.

Tovar made two motions relevant to this appeal. First, he moved to dismiss all counts on double-jeopardy grounds. Second, Tovar moved to suppress evidence seized during the search of his home, as well as statements that he made during and subsequent to the search.

The district court proceeded with Tovar's bench trial before ruling on his motions, reasoning: "I am going to allow the government to put on evidence to meet its burden of persuasion [on Tovar's double-jeopardy motion], which is probably going to be most of the same evidence as to the guilt-or-innocence phase; and I don't see a reason to do it twice." The government presented several witnesses, including Nunez, Mejia, law enforcement officials involved with the investigation of Tovar's case, and a drug analysis expert. The government also offered physical and documentary evidence, including the gun obtained in Tovar's residence, hotel receipts, and records obtained from U-Haul, which generally corroborated Tovar's involvement in the trips from Texas to Pennsylvania.

After hearing the evidence, the district court considered Tovar's double-jeopardy and suppression motions. It granted Tovar's double-jeopardy motion

No. 12-40557

to dismiss with respect to Count 1, denied it with respect to Counts 2–4, and denied Tovar's motion to suppress. Ultimately, the district court found Tovar guilty on Counts 2–4 and sentenced him to 90 months' imprisonment followed by a four-year term of supervised release.[4] Tovar timely appealed.

## II.

Tovar makes three arguments on appeal. First, he asserts that the district court erred in denying his double-jeopardy motion with respect to the non-conspiracy counts (Counts 2–4). Second, Tovar argues that the district court erred in denying his motion to suppress evidence obtained during the search of his home, as well as all statements that he made to law enforcement during and subsequent to the search. Finally, Tovar contends that the evidence is insufficient to sustain his conviction on Counts 2–4. We address each argument in turn.

## A.

The Fifth Amendment's Double Jeopardy Clause provides that no person

---

[4] Specifically, the district court sentenced Tovar as follows:

- Count 2: 90 months' imprisonment (concurrent with all counts of the Texas indictment, 70 months consecutive and 20 months concurrent with Tovar's Pennsylvania sentence), four years' supervised release (concurrent with all counts and cases), and a $100 special assessment;
- Count 3: 60 months' imprisonment (concurrent with all counts of the Texas indictment, consecutive with Tovar's Pennsylvania sentence), three years' supervised release (concurrent with all counts and cases), and a $100 special assessment; and
- Count 4: 90 months' imprisonment (concurrent with all counts of the Texas indictment, 70 months consecutive and 20 months concurrent with Tovar's Pennsylvania sentence), three years' supervised release (concurrent with all counts and cases), and a $100 special assessment.

shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  This constitutional guarantee "protects against a second prosecution for the same offense after conviction." *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (internal quotation marks and citation omitted); *see United States v. El-Mezain*, 664 F.3d 467, 546 (5th Cir. 2011), *as revised* (Dec. 27, 2011), *cert. denied*, 133 S. Ct. 525 (2012).

The defendant "bears the initial burden of establishing a *prima facie* claim of double jeopardy."  *United States v. Deshaw*, 974 F.2d 667, 670 (5th Cir. 1992) (citation omitted).  "If the defendant does so, the burden shifts to the government to demonstrate by a preponderance of the evidence that the indictment charges a crime separate from that for which the defendant previously was placed in jeopardy." *Id.* (citation omitted).

The longstanding test for determining whether two statutes constitute the "same offense" for double jeopardy purposes arises from *Blockburger v. United States*, 284 U.S. 299 (1932). There, the Supreme Court explained that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied . . . is whether each provision requires proof of a fact which the other does not." *Id*. at 304.  A court applying the *Blockburger* test must "focus[ ] on the statutory elements of the offense.  If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975); *see also United States v. Agofsky*, 458 F.3d 369, 371 (5th Cir. 2006) ("Under the *Blockburger* test, each offense must contain an element not contained in the other; if not,

No. 12-40557

they are the same offense . . . and double jeopardy bars subsequent punishment or prosecution." (internal citation and quotation marks omitted)).

Here, Tovar argues that the Texas charges address "the same conduct as charged and punished" in the Pennsylvania conspiracy. Because the district court dismissed Count 1—the Texas conspiracy charge—we need only consider whether the *substantive* offenses (Counts 2–4: possession with intent to distribute more than 100 kilograms of marijuana, interstate travel in aid of racketeering activity, and possession of an unregistered firearm) are the "same offense" as the Pennsylvania conspiracy under the *Blockburger* test.[5]

"It is settled law that conspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy." *United States v. Threadgill*, 172 F.3d 357, 367 (5th Cir. 1999); *see also United States v. Felix*, 503 U.S. 378, 391–92 (1992); *Deshaw*, 974 F.2d at 671. This court has applied this settled law in a host of similarly situated cases. For example, in *United States v. Kalish*, we considered "whether the double jeopardy clause bars the government from first prosecuting a defendant for conspiracy to commit a crime, and then, in a separate proceeding, charging the same defendant with an underlying substantive offense which may have been the object of that conspiracy." 734 F.2d 194, 196 (5th Cir. 1984). We answered no, explaining:

> The present case does not involve the prosecution of two conspiracy

---

[5] Tovar devotes a meaningful portion of his brief to the factors set forth in *United States v. Rabhan*, which govern our determination of whether a defendant participated in a single conspiracy or multiple conspiracies for double-jeopardy purposes. 628 F.3d 200, 205 (5th Cir. 2010). *Rabhan* has no force at this stage in the case, however, because the district court dismissed the Texas conspiracy charge. As a result, we need not evaluate the overlap between the Texas conspiracy and the Pennsylvania conspiracy.

> charges; it concerns a conspiracy prosecution followed by a charge for the underlying substantive offense. The appropriate standard for determining whether double jeopardy bars separate prosecutions, therefore, is the *Blockburger* test. *See United States v. Phillips*, 664 F.2d 971, 1005–06 [(5th Cir. 1992)]; *United States v. Dunbar*, 611 F.2d 985 [(5th Cir. 1980)] (en banc court specifically adopting the panel's use of the *Blockburger* test as the proper method to analyze this type of double jeopardy claim). And under the *Blockburger* test, the offenses of conspiracy to commit a crime and the crime itself are separate offenses. *Iannelli v. United States*, 95 S. Ct. 1284, 1293–94 n.17 (1975).

*Id.* at 198–99. Likewise, in *Deshaw*, we emphasized that the "overt acts charged in a conspiracy count may also be charged as substantive offenses, for the agreement to do the act is distinct from the act itself." 974 F.2d at 676. We concluded that the Double Jeopardy Clause did not bar "substantive marihuana counts and [interstate travel in aid of racketeering activity] counts" charged subsequent to an acquittal on a conspiracy charge. *Id.*[6]

With these cases in mind, even if Tovar's marijuana possession, interstate travel in aid of racketeering activity, and gun possession were a direct product of the Pennsylvania conspiracy, Tovar's double jeopardy argument fails. The

---

[6]*See also United States v. Longoria*, 202 F. App'x 700, 701 (5th Cir. 2006) (unpublished, but persuasive) ("A substantive crime and a conspiracy to commit that crime are not the same offense for double jeopardy purposes. Longoria's argument that being charged with, convicted of, and punished for the conspiracy and substantive counts subjected him to double jeopardy does not establish plain error." (internal citations omitted)); *United States v. Martinez-Gill*, No. 92-5626, 1994 WL 395053, at *7 (5th Cir. July 7, 1994) (unpublished, but persuasive) ("In the instant case, the count charging the offense of conspiracy required the government to prove that Hernandez voluntarily joined a conspiracy, which is not an element of the offense of heroin distribution. At the same time, the offense of heroin distribution requires the government to prove that the defendant distributed heroin, which is not an element of the offense of conspiracy. The government may therefore prosecute both crimes without running afoul of the double jeopardy clause. Hernandez's double jeopardy claim is without merit." (internal citations omitted)).

No. 12-40557

government could have charged Tovar with the otherwise-unprosecuted substantive offenses arising out of the Pennsylvania conspiracy *even after it obtained a guilty verdict on the conspiracy charge*. Moreover, applying *Blockburger*, the Pennsylvania conspiracy charge and Counts 2–4 in the Texas district court case depend on proof of different statutory elements. Unlike Counts 2–4 in the Texas case, the Pennsylvania conspiracy charge required the government to show that Tovar made an illegal agreement. Conversely, unlike the Pennsylvania conspiracy charge, Counts 2–4 required the government to prove that Tovar possessed and intended to distribute marijuana, engaged in interstate travel, and possessed an unregistered firearm, respectively.[7]

For these reasons, we affirm the district court's denial of Tovar's motion to dismiss Counts 2–4 on double jeopardy grounds. We turn next to Tovar's suppression arguments.

**B.**

When reviewing a denial of a motion to suppress evidence, we review factual findings for clear error and the ultimate questions of constitutionality *de novo*. *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) (citing *United States v. Perez*, 484 F.3d 735, 739 (5th Cir. 2007)). "A finding is clearly erroneous only if the court is left with a definite and firm conviction that a mistake has been committed." *Id.* (citing *United States v. Hernandez*, 279 F.3d 302, 306 (5th Cir. 2002)). We afford particular deference to factual findings

---

[7] Tovar also makes a collateral estoppel argument in passing, but his argument is without force. "The collateral-estoppel effect attributed to the double jeopardy clause may bar a later prosecution for a separate offense where the Government has *lost* an earlier prosecution involving the same facts. But this does not establish that the Government 'must . . . bring its prosecutions . . . together.' It is entirely free to bring them separately, and can win convictions in both." *United States v. Dixon*, 509 U.S. 688, 705 (1993).

10

No. 12-40557

when "denial of the suppression motion is based on live oral testimony . . . because the judge had the opportunity to observe the demeanor of the witnesses." *Id.* (quoting *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005)). Moreover, we must view the evidence "most favorably to the party prevailing below," unless such view "is inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole." *Id.* (citing *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993)). Thus, we will uphold the district court ruling "if there is any reasonable view of the evidence to support it." *Id.* (quoting *United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999)). Tovar makes two suppression arguments, which he did not urge at oral argument. We address them briefly in turn.

## 1.

First, Tovar asserts that the search of his home was unlawful because neither the relevant search warrant nor the affidavit on which the warrant was based included sufficient reliable information to establish probable cause, and the *Leon* good-faith exception did not apply.[8] *See United States v. Leon*, 468 U.S. 897, 921–25 (1984). This argument fails in light of the thorough and

---

[8] We apply a two-part analysis when a party challenges a seizure pursuant to a search warrant. *United States v. Allen*, 625 F.3d 830, 835 (5th Cir. 2010). First, we ask whether the seizure falls within the good-faith exception to the exclusionary rule. *Id.* That "inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* (quotation marks and citation omitted). If the good-faith exception is met, "this court affirms the district court's decision denying the motion to suppress." *Id.* Only when the exception does not apply do we proceed "to the second step and determine[ ] whether the magistrate issuing the warrant had a substantial basis for believing there was probable cause for the search." *Id.* (quotation marks and citation omitted). Probable cause simply requires "a fair probability" that evidence of a crime will be found and should be a "practical, common-sense decision." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

11

specific information contained in the affidavit in support of the search warrant, which includes but is not limited to:

- A four-and-a-half page description of the qualifications of the special agent assigned to the investigation;

- A description of the GPS coordinates and physical characteristics of Tovar's residence;

- The allegation that Tovar resided at the address and operated narcotics trafficking activities there;

- The observation that, in the agent's experience, narcotics traffickers tend to keep evidence of their unlawful activities in their homes.

- Statements by a named informant (Nunez) in Pennsylvania who admitted that Tovar had provided him with kilograms of cocaine;

- The allegation that agents discovered a check in Tovar's name in a safe owned by Nunez. "Nunez told [A]gents that the account was set up by [Nunez] and [Tovar] so that [Nunez] could deposit money directly into [Tovar's] account."

- A description of several recorded phone calls between Tovar and Nunez, in which the two discussed cocaine supply and deliveries;

- Nunez's positive identification of Tovar in a photo lineup;

- A traffic stop conducted in Pennsylvania, which revealed bricks of cocaine contained in a vehicle registered to Tovar;

- Statements by Nunez that Tovar had previously provided him with marijuana; and

- Receipts confirming Nunez's statements regarding trips that Tovar had taken for the purposes of drug trafficking.

After reviewing the warrant and supporting affidavit, the district court explained:

> When you take a look at this affidavit, it's very detailed. Agent Moore gives his qualifications. He goes into detail on

trafficking and then goes into extensive detail, starting at paragraph 6, on probable cause dealing with the prior arrest of Mr. Nunez, the check and so forth that Nunez turned over, the phone calls recorded from Nunez to Mr. Tovar on Nextel, numerous conversations being listened to, Nunez being shown a photo lineup and identifying Tovar as the broker and also the person known as "Hugo."

So, there is extensive background and factual basis for the magistrate judge to conclude.  But more for purposes of this analysis, any officer who received that warrant with that affidavit, it's not bare bones; and the officer would be justified in relying on the magistrate's probable cause determination and on the technical sufficiency of the warrant.

It's objectively reasonable. It's not lacking in indicia of probable cause. It doesn't contain any obviously false statements made intentionally with reckless regard for the truth, no indication the magistrate judge wholly abandoned his judicial role.  It's not lacking particularity; it's not just some general house somewhere in Cleveland[, Texas].

And therefore – and, in fact, it's not just merely indication – or information provided from some unknown or unidentified informant.  There were substantial details provided by Nunez, substantial details confirmed with these phone calls, the records from the officer in Pennsylvania with not only the name but also the address and driver's license numbers of Mr. Tovar showing his trips to Pennsylvania.

So, I find there is no evidence of the magistrate judge being intentionally or recklessly misled, no evidence that the magistrate wholly abandoned his role, no evidence that the warrant was facially deficient. And, so, I find . . . that the *Leon* good faith exception would apply.

We agree with this assessment.  The search warrant and accompanying affidavit include far more than mere boilerplate, and afford us no reason to conclude that the magistrate judge abandoned his role in reaching a neutral

No. 12-40557

probable cause determination. Likewise, a well-trained officer could, in good faith, rely on the magistrate judge's probable cause determination. Accordingly, the district court did not err in applying the good-faith exception and denying Tovar's motion to suppress the evidence obtained at his home.

**2.**

Second, Tovar argues that certain statements he made to the police were inadmissible fruit of a poisonous tree. This argument also fails. "[T]he exclusionary rule prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.'" *United States v. Hernandez*, 670 F.3d 616, 620–21 (5th Cir. 2012) (quoting *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001)). The central question in applying the exclusionary rule is not whether the evidence would have been discovered "but for" a constitutional violation, but rather whether the evidence is derived from exploitation of the illegality. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963); *see also Scroggins*, 599 F.3d at 446 ("This 'fruit of the poisonous tree' doctrine is limited to evidence 'derived from the exploitation of an illegal search or seizure.'" (quoting *United States v. Dortch*, 199 F.3d 193, 200 (5th Cir. 1999))).

Verbal statements, in addition to physical evidence, are subject to the exclusionary rule. *Wong Sun*, 371 U.S. at 485–86. "[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Id*. at 485. In determining admissibility, the Supreme Court considers the degree of free will exercised by the defendant and balances the cost of "exclusion [that] would perpetually disable a witness from

14

No. 12-40557

testifying about the relevant and material facts" against the need to deter unconstitutional conduct in the future. *United States v. Ceccolini*, 435 U.S. 268, 276–78 (1978).

Tovar made statements to the police at two relevant times: (1) during the search of his residence, before he received a *Miranda* warning,[9] and (2) once he was transported to the station, after he received multiple *Miranda* warnings. Tovar argues that police obtained his first statements unlawfully, as he was already under arrest when officers questioned him during the search of his residence. Thus, he asserts that these first, unlawfully obtained statements tainted the later admissions that he made during his interview at the station.

Assuming *arguendo* that Tovar's first statements were unlawfully obtained, the central question is whether Tovar's subsequent post-*Miranda* admissions were voluntary—that is, not a product of coercion or duress—and "sufficiently an act of free will to purge the primary taint." *Wong Sun*, 371 U.S. at 488; *see Brown v. Illinois*, 422 U.S. 590, 602–04 (1975). Tovar does not meaningfully argue that the interview was involuntary,[10] so the only question

---

[9] Tovar also argues that all statements he made before he received *Miranda* warnings are inadmissible. But the government never relied on those statements to prove its case. At the outset of trial, the prosecutor stated: "At this time I am going to not concede that pre-*Mirandized* statement. I'm just not going to submit that as a basis for the admissions that are appropriate for the court to hear to come in." After some dialogue, the court stated: "All right. So, those will be considered excluded." The prosecutor responded: "Well, not presented." The prosecutor maintained this position throughout the duration of the trial, and did not rely on the statements. Therefore, there is no need to consider whether admitting those statements would have been in error.

[10] Tovar's brief includes a one-line claim that his statements were involuntary, but he offers no specific evidence of coercion or duress. The district court specifically held that Tovar's statements were voluntarily made, noting:

> And, so, there is a question were the statements voluntarily made. So, the test here would be whether the confession was extracted by threats or

No. 12-40557

before us is whether Tovar's statements were a product of free will under *Wong Sun*. The relevant factors are: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances . . . and, particularly, the purpose and flagrancy of the official misconduct . . . ." *Brown*, 422 U.S. at 603–04 (citations omitted).

The district court carefully evaluated each *Wong Sun* factor, and we agree with its analysis. We will not repeat it here, except to emphasize that the facts surrounding the initial (presumed) misconduct weigh strongly against suppression in this case. There is no evidence that the special agents exploited Tovar's initial, pre-*Miranda* statements to obtain his later, post-*Miranda* admissions. *Cf. Missouri v. Seibert*, 542 U.S. 600, 604, 620–21 (2004) (requiring suppression where police used a two-step strategy to obtain a pre-warning statement, and then a post-warning statement that can be used at trial); *Oregon v. Elstad*, 470 U.S. 298, 305 (1985) (noting that defendant's arrest, made without probable cause, had a "quality of purposefulness" in that it was an "expedition

---

violence. No indication of any threats or violence here. We had, I think, three officers in the room. The first officer, I think, testified about they gave him something to drink first and then started questioning him after giving him his *Miranda* rights.

. . .

Defendant is intelligent. All of the intelligence – all of the evidence I've had so far is that he seems to be intelligent, able to speak English, understands his rights, able to read. From that point of view, I think that it's voluntary, keeping in mind the burden I think on the government at this point is preponderance of the evidence that it's voluntary. No evidence of improper promises or inducements. No indication that he asked for an attorney and they continued questioning him. So, I find that he was properly read his – given his *Miranda* rights, he actually signed it, and that the statements he made afterwards were not a result of duress or coercion, were not a result of improper promises or inducements, and were not made after a request for counsel.

We agree.

for evidence" admittedly undertaken "in the hope that something might turn up").[11]   The statements that Tovar made during the search of his residence, before he received *Miranda* warnings, were different in scope and substance from the admissions that he made during his interview, such that the later statements were not—as in *Brown*, 422 U.S. at 595–96, 605 and *Dunaway v. New York*, 442 U.S. 200, 227 n.20 (1979)—"clearly the result and the fruit of the first."

For these reasons, we affirm the district court's denial of Tovar's motions to suppress.  We next consider whether the evidence was sufficient to sustain Tovar's conviction.

## C.

When a defendant challenges a bench-trial conviction on sufficiency-of-the-evidence grounds, we focus on "'whether the finding of guilt is supported by substantial evidence, *i.e.*, evidence sufficient to justify the trial judge, as the trier of fact, in concluding beyond a reasonable doubt that the defendant is guilty.'" *United States v. Esparza*, 678 F.3d 389, 392 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1455 (2013) (quoting *United States v. Turner*, 319 F.3d 716, 720 (5th Cir. 2003)). We "should not weigh evidence, nor should [we] determine the credibility of witnesses." *Turner*, 319 F.3d at 720–21.  Rather, we must "view all evidence in the light most favorable to the government and defer to all reasonable inferences drawn by the trial court." *Id*. (quoting *United States v. Mathes*, 151 F.3d 251, 252 (5th Cir. 1998)).

---

[11] Where, as here, there is no evidence of a two-step strategy as described in *Seibert*, "'[t]he admissibility of postwarning statements [ ] continue[s] to be governed by the principles of *Elstad*.'" *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006) (quoting *Seibert*, 542 U.S. at 622) (modifications in original).

No. 12-40557

Tovar challenges the sufficiency of the evidence regarding all of the counts on which he was convicted (Counts 2–4).  We consider each in turn.

### 1.

Count 2 charged Tovar with possession with intent to distribute over 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1).[12]  "To establish a violation of 21 U.S.C. § 841(a)(1), 'the government must prove knowing possession of the contraband with intent to distribute.'"  *United States v. Skipper*, 74 F.3d 608, 611 (5th Cir. 1996) (quoting *United States v. Cardenas*, 9 F.3d 1139, 1158 (5th Cir. 1993)).  The government may prove knowledge by either direct or circumstantial evidence, and possession may be actual or constructive.  *Id.*; *United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995).

Tovar argues that the government failed to establish knowing possession.  Specifically, he asserts that the "government's case is based solely on the statements of a self-interested cooperating co-defendant and the proximity of Mr. Tovar to the marijuana," which is "insufficient to show knowing possession."  Tovar further asserts that the government can prove neither actual possession (because he had no marijuana in his possession at the time of his arrest) nor constructive possession (because the contraband was contained in sealed compartments inside a vehicle, which requires the government to demonstrate additional circumstantial evidence of guilty knowledge).

Tovar cannot succeed in light of the record evidence.  The government offered specific testimony from both Nunez and Mejia that Tovar *actually* possessed the marijuana in question during at least two of the four trips, which

[12] Specifically, the indictment charged Tovar with possession with intent to distribute marijuana on or about January 24, 2009.  Tovar does not seek to exclude evidence of the loads transported in late 2008, December 2008, or February 2009 despite this date limitation.

the court found credible.[13]   This evidence, standing alone, is enough to sustain the verdict.[14]   *United States v. Mendoza*, 522 F.3d 482, 489 (5th Cir. 2008) ("Evidence consisting entirely of testimony from accomplices or conspirators is sufficient.") (citing *Turner*, 319 F.3d at 721)); *see United States v. Westbrook*, 119 F.3d 1176, 1190 (5th Cir. 1997) ("As long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution of leniency, may be constitutionally sufficient evidence to convict.").   Moreover, Tovar himself admitted during his interview that he drove at least one load to Pennsylvania and that he acted as a "broker," providing Mejia with a truck and trailer to transport the drugs.  This, especially when viewed in tandem with the corroborating documentary evidence in the record, is more than sufficient to show that Tovar had knowing possession—actual and constructive—of the marijuana.

## 2.

Count 3 charged Tovar with interstate travel in aid of racketeering activity in violation of 18 U.S.C. § 1952.[15]   In the context of this case, the government had to prove: (1) that Tovar traveled in interstate commerce; (2) with the specific intent to promote, manage, establish, or carry on—or distribute

---

[13] Tovar does not expressly argue that the government failed to prove his involvement with a sufficient *weight* of marijuana, that is, 100 kilograms.

[14] Thus, we need not engage in a constructive possession analysis, and the government need not establish any additional circumstantial evidence of guilty knowledge.

[15] As with the marijuana charge, the indictment charged him with interstate travel in aid of racketeering activity on or about January 24, 2009.  Again, Tovar does not seek to exclude evidence of the loads transported in late 2008, December 2008, or February 2009 despite this date limitation.

No. 12-40557

the proceeds of—unlawful activity; and (3) that Tovar committed a knowing and willful act in furtherance of that intent, subsequent to the act of travel in interstate commerce. *E.g.*, *United States v. Logan*, 949 F.2d 1370, 1380–83 (5th Cir. 1991).

Tovar makes two cursory arguments to challenge his conviction on Count 3. First, he asserts that "the record is devoid of evidence that anyone traveled the interstates at Mr. Tovar's direction to deliver to him illegal drugs." This argument fails because the record is, in fact, replete with evidence that both Tovar and Mejia—acting at Tovar's direction—traveled from Texas to Pennsylvania to deliver drugs to Nunez. That the delivery was *from* Tovar, not *to* him is of no moment to the legal analysis. Second, Tovar argues that "any drug activity did not constitute a continuous course of conduct." This too fails, as the district court's factual findings make it clear that Tovar was associated with an ongoing criminal venture:

> It is quite clear from the evidence of Nunez and Mejia that he was up there to promote or manage or carry on the sale of the marijuana or the transport of marijuana . . . . Business enterprise can't be sporadic. But here we have testimony of numerous trips; so, I find that it has been proven beyond a reasonable doubt that defendant had the specific intent to promote, manage, establish, or carry on or distribute the proceeds of an unlawful activity.

Considering the deference owed to the verdict, there is sufficient evidence to sustain Tovar's conviction on this count.

### 3.

Count 4 charged Tovar with possession of an unregistered firearm (a short-barrel shotgun) in violation of 26 U.S.C. § 5861(d). The elements of this charge are that: (1) Tovar knowingly possessed a firearm, as described in the

No. 12-40557

Texas indictment; (2) that it was a firearm (here, a shotgun with a barrel length of less than 18 inches or an overall length of less than 26 inches); (3) Tovar was aware of the characteristics of the firearm; (4) that the firearm was or could readily be put in operating condition; and (5) that the firearm was not registered to Tovar.  *See* Fed. Jury Prac. & Instr. (Criminal) § 39:24 (6th ed. 2013).

Again, Tovar makes two relatively summary arguments.  First, he argues that the government failed to show knowing possession of the firearm because the firearm was secreted.  But Tovar himself admitted, after he received *Miranda* warnings, that he obtained the gun from his cousin.  This is sufficient to show knowing possession.

Second, Tovar argues that the government failed to show that he knew the firearm had features that brought it within the scope of the statute.  We have held that "[w]hen a shotgun's length is immediately apparent and externally visible to anyone observing it, the government's ability to prove knowledge should not be an onerous task." *United States v. Reyna*, 130 F.3d 104, 109 n.6 (5th Cir. 1997) ("'The fact that a shotgun's length is obvious and apparent is . . . a means of proving knowledge.'" (quoting *United States v. Edwards*, 90 F.3d 199, 205 (7th Cir. 1996))).  In an unpublished, but persuasive, case, we have held that a factfinder may infer a defendant's knowledge based on the obvious characteristics of a firearm.  *See, e.g.*, *United States v. Williamson*, 170 F. App'x 889, 890 (5th Cir. 2006) ("The shotgun was in evidence and could be inspected by the jury. Its barrel was 10 inches long and its overall length was only 16 and one-half inches long. Such characteristics would be readily apparent and externally visible. . . . A rational jury could have concluded that Williamson knew of the characteristics of his weapon that made it a 'firearm' subject to

No. 12-40557

registration under § 5845(a)(1) and (2)." (internal citation omitted)).

Tovar asserts that the government did not meet its burden to prove that he knew about the illegal features of the shotgun (namely, its length). At oral argument, Tovar relied on testimony by government witness Special Agent Christian Bockman, to make his point. According to Tovar, even Special Agent Bockman "did not find [the shotgun's too-short length] to be readily apparent on its face." Counsel said that Special Agent Bockman's testimony indicated that the shotgun barrel appeared to be manufactured, not sawed-off, and that he "had to measure it to determine it was too short." Our review of the trial transcript paints a different picture. Agent Bockman testified that the cut of the barrel was "smooth," such that the gun appeared to have been modified with some kind of machinery (as opposed, for instance, to a hacksaw), but that fact says nothing regarding whether the barrel was obviously too short. Moreover, Special Agent Bockman did not say that he "had to measure" the barrel to see if it was too short. Rather, when asked "did you have an occasion to measure that weapon to make sure that it was not the legal length?" Special Agent Bockman answered, "Yes, sir. When I first got to the ICE office, I measured the weapon; and it was underneath the legal limit." This testimony in no way implies that Special Agent Bockman could not tell that the shotgun barrel was too short with his naked eye; it simply indicates that he measured it to determine precisely how short it was.

The district court heard Special Agent Bockman's testimony and carefully examined the weapon itself. It concluded that the length of the shotgun was immediately apparent:

> And it is also quite evident from just looking at the shotgun that it is sawed off or short. Anybody who handled that shotgun

22

No. 12-40557

once or picked it up would have known.  It's not a close call.  It's not a half inch missing off the barrel or quarter inch or something like that.  It's not a stock that was cut down just a couple of inches so a child – what they call a "youth model."  It's not that.  It's cut – the stock is basically gone completely and it just has a pistol grip and the barrel is cut down so that it is basically an inch or so past the cylinder in which the – or chamber in which the rounds are fed.

. . . I'm going to find beyond a reasonable doubt that the defendant did know of the characteristics, *i.e.*, knew that it was a short-barreled shotgun and that it was an overall short weapon.

Considering the district court's reasonable assessment of the visible qualities of the shotgun, Tovar's argument is without merit.   *See Reyna*, 130 F.3d at 109 n.6.  Thus, the evidence was sufficient to convict Tovar on Count 4.

## CONCLUSION

Because Tovar's double-jeopardy, suppression, and sufficiency-of-the-evidence arguments are without merit, we AFFIRM.